IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

March 31, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ E. Jones
DEPUTY CLERK

| | | |
|---|---|---|
| **SHERRILL WORTH STOCKTON, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.: 7:23-cv-00646** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NEW YORK LIFE INSURANCE CO.,** | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter comes before the Court on six pending motions for summary judgment. Plaintiff Sherrill Worth Stockton, III has filed the following: (1) Motion for Summary Judgment on Defendant's First and Third Counterclaims (Dkt. 105); (2) Motion for Summary Judgment with Respect to Defendant's Attempt to Rescind Plaintiff's Coverage Under the Policy (Dkt. 109); (3) Motion for Summary Judgment with Respect to Defendant's Third Affirmative Defense of Payment and Accord and Satisfaction (Dkt. 113); and (4) Motion for Summary Judgment to Apply the Clean Hands Doctrine to Defendant's Attempt to Rescind Plaintiff's Coverage Under the Policy (Dkt. 142). Defendant New York Life Insurance Company ("NY Life") has filed the following: (1) Motion for Summary Judgment (Dkt. 144); and (2) Cross-Motion for Summary Judgment Regarding Unclean Hands (Dkt. 149).

For the reasons below, Plaintiff's Motion for Summary Judgment on Defendant's First and Third Counterclaims (Dkt. 105) and Motion for Summary Judgment with Respect to Defendant's Third Affirmative Defense of Payment and Accord and Satisfaction (Dkt. 113) are **GRANTED**. All other motions are **DENIED**.

## I.  Background

Stockton is a physician specializing in emergency medicine. Dkt. 76 ¶ 5. In April 2020, Stockton applied for disability income insurance coverage under a group policy issued by NY Life (the "Policy"). *See* Dkt. 166.[1] His coverage became effective June 1, 2020. Dkt. 76 ¶ 6.

### A.  The Application Process

When applying for coverage, Stockton completed a Request for Group Insurance application form in which he represented that his average monthly income was $28,000, that he had other disability insurance totaling $15,000 per month with Standard Insurance Company and Principal Financial Group, and that the NY Life coverage would replace these existing policies in the amount of $15,000 per month. *See* Dkt. 16-2 at 2. However, Stockton failed to disclose a third disability policy of an additional $10,000 per month with his employer. *See* Dkts. 106 at 4, 86-1 at 9–11.

Additionally, as part of the application process, Stockton participated in a telephone

---

[1] On October 2, 2025, I ordered NY Life to file a certified copy of Group Insurance Policy No. G-30639-0 as it was in effect when Stockton applied for disability coverage in June 2020. NY Life did so, certifying that the provided policy "was in effect as of June 1, 2020." Dkt. 166 at 1. Stockton then filed a Motion for Consideration of Arguments in Response to the Certified Copy of Policy Documents Filed by Defendant on October 14, 2025 (Doc. 166 & 166-1), refusing to concede the authenticity of the documents. Dkt. 168. Stockton first argues that the Corporate Vice President who executed the certification lacked direct personal knowledge of the Policy. I find the certification sufficient. A corporate representative may authenticate business records based on familiarity with the company's record-keeping practices even if he did not personally prepare or maintain the records. *See, e.g.*, *United States v. Adefehinti*, 510 F.3d 319, 325–26 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008), *judgment entered*, 264 F. App'x 16 (D.C. Cir. 2008). Here, Corporate Vice President Christopher Flamand attests that he is "familiar with the files, records, and/or policy contracts maintained by [NY Life's] Group Membership Association relating to Dr. Sherrill Worth Stockton, III." Dkt. 166-1 at 1. Stockton also argues that NY Life has not established what version of the Policy was in effect in 2022 when he filed his claim. While the parties disagree about which policy governs Stockton's claim, that disagreement does not affect the Court's analysis of the present motions. If anything, the dispute only underscores the existence of factual issues that preclude summary judgment.

interview. NY Life alleges that during this interview, Stockton failed to disclose: (1) during the previous five years he had experienced neck pain and shoulder pain; and (2) during the previous two years he had participated in and suffered injuries from mountaineering and rock climbing. *See* Dkts. 16-14 at 2, 150 at 7–8. NY Life further asserts that Stockton authorized his signature to be electronically affixed to a Statement of Insurability documenting his responses during this interview. *See* Dkt. 136 at 25.

### B. The Policy Terms

NY Life approved Stockton's application and provided him with a Certificate of Insurance. The Certificate stated that it was "a summary of the provisions of the Policy" and "not a contract of insurance," and that "[a]ny conflict between the terms of the Certificate and the Policy will be decided in favor of the Policy." Dkt. 16-6 at 3. NY Life did not provide Stockton with a complete copy of the Policy itself. *See* Dkt. 148 at 5.

Several provisions of the Policy are central to the parties' disputes. First, NY Life asserts that the Policy contains the following monthly benefit provision:

> A Monthly Benefit is not available to an APPLICANT if the amount of the Monthly Benefit, when combined with the total of any other disability insurance, prorated monthly, for which the APPLICANT is insured or for which he or she is applying, would exceed 66 2/3 % of his or her AVERAGE MONTHLY INCOME or $30,000, whichever is less, subject to New York Life's Underwriting requirements.

Dkt. 166-1 at 33. However, the parties disagree as to whether this provision was in effect when Stockton's coverage became effective. The 66 2/3% provision appears in a 2018 version of the Policy, *see id.* at 7, and a 2019 version of the Policy labeled as a Replacement Page, *see id.* at 33.[2] Stockton does not concede that either version applied to him. Dkt. 169 at 3. Stockton further alleges that this provision was not disclosed to him in the Certificate of Insurance he received. *Id.*

---

[2] The parties previously referred to another copy of the Policy containing the monthly benefit provision that is dated March 1, 2023. *See* Dkt. 16-8 at 5.

at 3–6.

Second, the Policy provides in relevant part:

[A]n INSURED PERSON'S insurance will end on the earliest of:

> 1. the date the INSURED PERSON is no longer at ACTIVELY ENGAGED FULL-TIME WORK. The INSURED PERSON must immediately notify New York Life of the date that: (a) ACTIVELY ENGAGED FULL-TIME WORK ended; or (b) he or she retired.

Dkt. 166-1 at 14.

Third, the Policy contains an incontestability provision stating:

> Except for provisions which relate to eligibility for insurance and for nonpayment of PREMIUM, New York Life cannot contest the validity of any insurance on an INSURED PERSON after it has been in force for two years prior to the contest under the Policy during such INSURED PERSON'S lifetime.

*Id.* at 16. If NY Life contests coverage, it may "only rely upon: (a) written statements signed by the INSURED PERSON: (1) in applying for such insurance." *Id.*

Finally, the Policy contains notice of claim and proof of loss requirements. The notice of claim provision states: "The claimant must contact the Administrator about a claim within 30 days after the commencement of any disability covered by the Policy." *Id.* However, "[f]ailure to give notice within such time shall not invalidate nor reduce any claim if it can be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible." *Id.* The proof of loss provision, in turn, states: "The Administrator must receive satisfactory proof of the Covered Disability within 90 days after the date of the: (a) WAITING PERIOD for a Covered Disability." *Id.*

### C. Stockton's Disability and Claim

Stockton continued working as an emergency physician until April 2022, when he began experiencing cognitive and physical symptoms later diagnosed as Lewy body dementia. Stockton alleges that these symptoms prevented him from performing his duties as an emergency

physician. *See* Dkt. 76 ¶¶ 10–11.

On December 11, 2022—more than six months after the contestability period expired and approximately eight months after he stopped working—Stockton submitted a claim for disability benefits. *Id.* ¶ 9. In the claim form, Stockton stated that his last day worked was April 19, 2022,[3] and that he was suffering from "Cognitive Decline/Dementia." Dkt. 16-10 at 1. Stockton also disclosed all three of his disability insurance policies in his form, including the employer-provided policy he had not mentioned in his original application. *See id.* at 4. Importantly, at the time Stockton filed his claim, no physician had diagnosed him with cognitive decline or dementia. *See* Dkt. 93-2 at 8.

### D. NY Life's Investigation and Rescission

After Stockton submitted his claim, NY Life engaged in correspondence with Stockton requesting additional documentation. NY Life did not question Stockton about his other insurance or the benefits he was receiving from other carriers during this time and continued to accept premium payments from Stockton through June 2023. *See* Dkt. 148 at 8, 10.

On March 7, 2023—the same day Stockton completed his claim by submitting a medical provider's statement—NY Life notified Stockton that it was conducting a "routine investigation" because his claim "was submitted within 2 years from the effective date of coverage." Dkt. 85-32 at 1. In reality, Stockton's coverage had been in effect for more than two and a half years when he submitted his claim.

On June 23, 2023, NY Life rescinded Stockton's coverage based on alleged misrepresentations Stockton made during the telephone interview on April 29, 2020 about his

---

[3] Stockton has since corrected the disability date, testifying at his deposition that April 24, 2022 was the correct date. *See* Dkt. 85 ¶ 14.

medical history and recreational activities. Accompanying the rescission letter was an unsolicited check in the amount of $12,926.49, representing a refund of all premium contributions plus interest that Stockton had paid from June 2020 to June 2023. *See* Dkt. 16-14. Stockton did not request this check, has not deposited or negotiated it, and has expressed his willingness and ability to return it to NY Life. Dkt. 85 ¶ 35.

## II.    Standard of Review

Federal Rule of Civil Procedure 56 requires that the court "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once the movant properly makes and supports a motion for summary judgment, the opposing party must show that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the court views the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *See Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). On the contrary, the court has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp.*, 477 U.S. at 317).

## III.    Analysis

### A. Plaintiff's Motion for Summary Judgment on Defendant's First and Third Counterclaims (Dkt. 105)

Stockton moves for summary judgment on NY Life's First Counterclaim, fraud in the inducement, and Third Counterclaim, breach of the implied covenant of good faith and fair

dealing, arguing that NY Life has suffered no compensable damages and that the counterclaims fail on their merits.

I previously denied Stockton's motion to dismiss the counterclaims. However, the record has since developed through discovery, and NY Life has failed to produce evidence of any compensable damages.

Damages are an essential element of NY Life's counterclaims. To sustain a claim for fraud, a party must prove by clear and convincing evidence actual damage to the party misled. *See Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). Likewise, "injury or damage to the plaintiff caused by the breach of obligation" is a necessary element of a breach of contract action. *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004) (citations omitted). I find that NY Life's asserted remedies do not satisfy the damages element.

First, NY Life's counterclaims allege damages only in the most conclusory terms. Specifically, NY Life states that it has been damaged by (1) having to respond to Stockton's claim for benefits and (2) having to defend the instant lawsuit. Dkt. 77 at 16, 20. However, NY Life has not quantified these costs nor explained what portion of the costs, if any, exceeds the ordinary expenses of evaluating and defending a disability claim. Furthermore, in its prayer for relief, NY Life requests "compensatory damages in an amount to be determined at trial"—a formulation that effectively admits NY Life has not identified or calculated its alleged damages. Such vagueness is fatal at this stage. A party cannot defeat summary judgment by invoking damages that are merely speculative. *See, e.g.*, *Bernsen v. Innovative Legal Mktg., LLC*, No. 2:11CV546, 2012 WL 3912759, at *2–4 (E.D. Va. Sept. 6, 2012) (finding that defendant failed to establish damages with reasonable certainty where the only evidence was an affidavit containing conclusory allegations).

Second, even accepting that NY Life incurred costs investigating Stockton's claim and defending this litigation, NY Life has presented no evidence that these costs were extraordinary, unusual, or would not have been incurred during the normal underwriting and claims review process. Indeed, the day that Stockton completed his claim, NY Life informed Stockton that it was conducting a "routine" investigation, and only after months of investigation did NY Life rescind the Policy based on alleged fraudulent misstatements in Stockton's application. Because NY Life has not pled facts showing its investigation costs were attributable to the alleged fraud as opposed to standard underwriting procedures, NY Life cannot demonstrate that the fraud caused the costs alleged.

Third, while NY Life correctly asserts that rescission is an equitable remedy available in fraud or breach of contract actions, rescission is not itself a basis for calculating damages. *See Young-Allen v. Bank of Am., N.A.*, 839 S.E.2d 897, 900–01 (Va. 2020) (explaining that rescission is not a cause of action in itself); *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 614 n.8 (4th Cir. 2021). Here, NY Life has already rescinded the Policy and appears only to ask the Court to uphold the rescission. Such relief is defensive in nature and cannot be used as the basis for a counterclaim seeking affirmative damages recovery. If Stockton's claims fail, rescission stands without any counterclaim.

Fourth, while disgorgement is available as a potential equitable remedy to prevent unjust enrichment, *see Makel v. Tredegar Tr. Co.*, No. CH05-339, 2005 WL 3489768, at *2 (Va. Cir. Ct. Oct. 24, 2005), it requires that the opposing party obtained a benefit. Otherwise, there is no profit to disgorge. Because Stockton has received no benefits under the Policy and has not accepted the refunded premiums, there is no enrichment and therefore nothing to disgorge.

Finally, Virginia generally adheres to the American Rule under which parties bear their

8

own attorneys' fees "absent a specific contractual or statutory provision to the contrary." *Chacey v. Garvey*, 781 S.E.2d 357, 360 (Va. 2015) (quoting *REVI, LLC v. Chicago Title Ins. Co.*, 776 S.E.2d 808, 813 (Va. 2015)). No such provision exists here. While an exception to the general rule may exist in fraud cases, the trial court has discretion in determining whether or not "the circumstances surrounding the fraudulent acts and the nature of the relief granted compel an award of attorney's fees." *St. John v. Thompson*, 854 S.E.2d 648, 651 (Va. 2021) (citing *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 301 (Va. 1999)). In this case, NY Life has not identified any compensable damages independent of attorneys' fees. When attorneys' fees are the only claimed damages, the exception collapses into circularity: The court cannot award attorneys' fees based on a fraud claim that has no damages apart from those fees. Additionally, even if equitable relief might be available, the circumstances of this case do not "compel" an award of attorneys' fees. NY Life initiated the investigation and made the business decision to rescind the policy. NY Life has not demonstrated that Stockton's alleged fraud forced extraordinary litigation costs beyond what would be incurred in defending a typical disputed claim.

Having identified no evidence of compensable damages, NY Life's counterclaims fail as a matter of law, and the Court need not address the merits of the underlying theories. Plaintiff's Motion for Summary Judgment on Defendant's First and Third Counterclaims is **GRANTED**.

## B. Plaintiff's Motion for Summary Judgment with Respect to Defendant's Attempt to Rescind Coverage (Dkt. 109)

Stockton argues he is entitled to summary judgment because he is authorized to enforce the Policy's incontestability provision and NY Life had no right to rescind his coverage. The motion raises two primary issues: (1) whether Stockton is estopped from enforcing the

9

incontestability provision[4] and (2) whether NY Life can satisfy the statutory and contractual requirements for rescission.

### 1. Estoppel from Enforcing the Incontestability Provision

Stockton first argues he is not estopped from enforcing the incontestability provision. To establish equitable estoppel under Virginia law, a party must prove by clear, precise, and unequivocal evidence that: (1) there was a representation or concealment of material facts; (2) the representation or concealment was made with knowledge of the true state of facts; (3) the party to whom it was made was ignorant of the truth of the matter; (4) the representation was made with the intention that the other party should act on it; (5) the representation or concealment induced the action of the other party; and (6) the party claiming estoppel was misled to her injury. *Anderson v. Cox*, 977 F. Supp. 413, 416 (W.D. Va. 1997) (citing *Westminster Investing Corp. v. Lamps Unlimited, Inc.,* 379 S.E.2d 316, 319 n.2 (Va. 1989)).

While the parties have framed their arguments in terms of estoppel, I have reservations about whether estoppel is the proper analytical lens. The record contains little evidence that either party changed its position in reliance on the other's conduct—an essential component of estoppel. Nevertheless, applying the framework the parties have invoked, I find that genuine disputes of material fact preclude summary judgment.

### a. Stockton's Delay in Filing His Claim

The most significant factual dispute concerns whether Stockton's eight-month delay in filing his disability claim estops him from enforcing the incontestability provision. NY Life

---

[4] NY Life previously filed a Cross-Motion for Partial Summary Judgment arguing that Stockton is estopped from enforcing the contestability period. Dkt. 26. I denied the motion, concluding that the record at that time did not establish that NY Life would have investigated and rescinded the Policy before the contestability period expired. *See* Dkt. 36 at 11.

argues that Stockton deliberately delayed filing his claim until after the contestability period

expired, thereby preventing NY Life from investigating and contesting his coverage before June

1, 2022. A deliberate delay in filing a notice of claim, knowing that the insurer would be

precluded from investigating the claim, may bar a plaintiff from invoking the incontestability

clause. *See Brown v. Massachusetts Cas. Ins. Co.*, No. 93-56619, 1995 WL 470855, at *2 (C.D.

Cal. 1995) (citing *Ferguson v. Unionmutual Stock Life Ins. Co. of Am.*, 673 F.2d 253, 255 (8th

Cir. 1982)).

Whether Stockton's delay was deliberate and calculated to bypass the contestability

period presents a factual question that cannot be resolved on summary judgment. NY Life points

to evidence suggesting intentional delay, including: (1) Stockton's personal timeline marking

"Two Years" and "June 1" as the "LAST DAY FOR RESCISSION," Dkt. 136-1 at 27; (2)

Stockton's deposition testimony that at some point he determined, "I can't wait forever to turn

these damn things in," *id.* at 17; (3) Stockton's admission that he chose not to submit his claim in

April 2022 because he had no physician saying he had the condition, *id.* at 16; and (4) the fact

that Stockton waited nearly eight months after his alleged disability onset before filing his claim,

during which time he started a real estate business and enjoyed an inheritance from his father, *id.*

at 14, 16. Stockton, on the other hand, maintains that his conduct was not calculated to deprive

NY Life of its contestability rights. He contends that he filed his claim when he reasonably could

and that any delay was justified by legitimate reasons including the need to obtain a proper

diagnosis. These competing accounts present credibility determinations inappropriate for

resolution on summary judgment. A jury must determine whether Stockton intentionally delayed

filing his claim to avoid the contestability period, or whether his conduct was reasonable under

the circumstances.

### b. Notice Requirements and Timing

Material factual disputes also exist regarding the Policy's notice requirements and whether Stockton's failure to provide timely notice estops him from enforcing the incontestability provision.

The Policy's notice of claim provision states: "The claimant must contact the Administrator about a claim within 30 days after the commencement of any disability covered by the Policy." Dkt. 166-1 at 16. Stockton argues this provision should be construed to require notice only after the six-month waiting period expires, not within 30 days of disability onset. Stockton contends that because he could not claim benefits until the waiting period expired in October 2022, the notice provision cannot reasonably be read to require earlier notice. NY Life, in turn, argues the provision unambiguously requires notice within 30 days of disability onset, regardless of the waiting period. According to NY Life, the phrase "commencement of any disability covered by the Policy" plainly refers to when the disability begins, not when benefits become payable.

Under Virginia law, ambiguous policy language must be construed in favor of coverage and against the insurer. *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009) (citations omitted). However, "when the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written." *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530 S.E.2d 154, 160 (Va. 2000) (citations omitted).

I find that the language of the notice provision is unambiguous. "[C]ommencement of any disability" clearly refers to the onset of disability. Nothing in this language ties the notice obligation to the expiration of the waiting period or to the date benefits first become payable.

12

Had the drafters of the Policy intended to tie the notice deadline to the expiration of the waiting period, they could have said so. Nonetheless, at this stage, I decline to determine whether Stockton's failure to comply with the notice of claim provision bars him from receiving benefits.

Additionally, the notice provision contains an exception: "Failure to give notice within such time shall not invalidate nor reduce any claim if it can be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible." Dkt. 166-1 at 16. Genuine disputes exist regarding whether Stockton can satisfy this exception. Stockton has not presented evidence explaining why it was not reasonably possible to give notice by May 2022, or why his December 2022 notice constituted notice given "as soon as was reasonably possible." NY Life argues the evidence shows Stockton deliberately chose to delay giving notice, not that delay was unavoidable. These factual questions must be resolved by a jury.

### c.   Whether NY Life Would Have Contested Before June 1, 2022

Assuming Stockton failed to provide timely notice of his claim, material disputes exist regarding whether NY Life would have contested his coverage before the contestability period expired on June 1, 2022 had notice been timely. I previously held that NY Life "has offered no evidence that had Stockton submitted his claim when he left his job in April 2022 that it would have investigated the claim and rescinded the Policy before the incontestability period expired in June 2022." Dkt. 36 at 11.

Stockton argues the evidence now in the record confirms NY Life could not have completed its investigation and rescission between May 19, 2022 when timely notice would have been due, and June 1, 2022 when the contestability period expired. Stockton notes that NY Life took approximately six-and-a-half months from receiving his claim to rescind coverage, and that

13

even between March 7, 2023 when the claim was completed, and June 23, 2023 when coverage was rescinded, more than three months elapsed.

NY Life responds that the incontestability provision requires only that it "contest" coverage within the two-year period, not that it complete its investigation and rescission within that timeframe. According to NY Life, "contest" means to "call into question or challenge," and the provision uses future tense ("will only rely upon") to describe what the contest will involve, indicating that investigation and rescission occur after the contest is invoked. Dkt. 136 at 17. NY Life points to its March 7, 2023 conduct—initiating its contestable review the same day Stockton completed his claim—as evidence it would have similarly initiated a contest immediately upon receiving timely notice in May 2022.

This dispute involves both legal and factual questions. As a legal matter, the parties disagree about whether the incontestability provision requires NY Life to complete rescission within the contestability period or merely initiate its contest. The provision's language is susceptible to multiple interpretations. As a factual matter, even if merely initiating a contest suffices, disputes exist about what NY Life would have done in May 2022. While NY Life's March 7, 2023, conduct provides some evidence, the circumstances were different. By then, the contestability period had long expired, and NY Life had already been corresponding with Stockton for months. Whether NY Life would have acted with similar speed in May 2022, when the claim was timely and the contestability period was about to expire, presents a genuine factual question.

### d. Waiver

Stockton argues that NY Life waived any rights arising from his failure to give timely notice by engaging in five months of correspondence without mentioning the timeliness issue.

Waiver requires proof of two elements: "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right." *Fox v. Deese*, 362 S.E.2d 699, 707 (Va. 1987) (citation omitted). It can be shown through "conduct, acts, or a course of dealing." *Woodmen of World Life Ins. Soc. v. Grant*, 38 S.E.2d 450, 454 (Va. 1946).

NY Life responds that it did not waive its estoppel defense because it (1) initiated its contestability review immediately upon Stockton completing his claim on March 7, 2023 and (2) timely asserted its estoppel defense in this litigation. Genuine factual disputes exist regarding whether NY Life's conduct constituted waiver. While Stockton's interpretation of NY Life's silence as waiver is plausible, a jury must determine whether NY Life voluntarily and intentionally abandoned a known right, or whether it preserved its rights by timely asserting them once the claim was complete.

### e.  First Material Breach

In response to Stockton's motion, NY Life argues that Stockton committed the first material breach of the Policy, which estops him from enforcing the contract. Specifically, NY Life contends that Stockton breached his obligation to provide timely notice and to accurately identify his disability onset date. According to NY Life, these breaches occurred before any alleged breach by NY Life, and therefore Stockton cannot recover.

Under Virginia law, notice and proof-of-loss requirements in an insurance policy are conditions precedent to recovery under an insurance policy. *See Nationwide Mut. Fire Ins. Co. v. Overstreet*, 568 F. Supp. 2d 638, 647 (E.D. Va. 2008) (citing *State Farm Mut. Auto. Ins. Co. v. Porter.*, 272 S.E.2d 196, 199–200 (Va. 1980); *Erie Ins. Exch. v. Meeks*, 288 S.E.2d 454 (Va. 1982)). Where a claimant fails to satisfy such conditions, the insurer's obligation to pay does not arise because the claimant has not done what the policy requires to put the claim in a payable

posture. The material breach framework invoked by NY Life is therefore not the most precise

framework here. Rather, the question is whether Stockton did what the Policy required of him,

and if not, what consequence follows under Virginia law.

In any event, Stockton argues that any error in the disability was inadvertent and that his

delay in filing his claim was reasonable. Whether Stockton satisfied the Policy's requirements

and whether any deficiency in his compliance prejudiced NY Life or otherwise excuses

performance involve factual disputes that cannot be resolved on summary judgment.

Accordingly, summary judgment is denied on this issue.

### 2. Whether NY Life Can Satisfy Requirements for Rescission

Stockton next argues that even if he is estopped from enforcing the two-year limitation on

contestability, NY Life is not entitled to rescind coverage because it cannot comply with Virginia

statutory requirements or the Policy's incontestability provision.

Under Virginia Code § 38.2-309, an insurer seeking to void a policy must prove by clear

evidence: (1) that the statement or omission in the application was untrue; and (2) that the

insurer's reliance on the false statement or omission was material to its decision to issue the

policy. *Com. Underwriters Ins. Co. v. Hunt & Calderone, P.C.*, 540 S.E.2d 491, 493 (Va. 2001)

(citing *Harrell v. N. Carolina Mut. Life Ins. Co.*, 213 S.E.2d 792, 794–95 (Va. 1975)). A fact is

material if "knowledge of the item would affect a person's decision-making process," and

specifically, if it "would have reasonably influenced the company's decision to issue the policy"

to the applicant. *Montgomery Mut. Ins. Co. v. Riddle*, 587 S.E.2d 513, 543 (Va. 2003) (citation

omitted); *see also Mut. of Omaha Ins. Co. v. Echols*, 154 S.E.2d 169, 172 (Va. 1967).

The Policy's incontestability provision further requires NY Life to "only rely upon . . .

written statements signed by the INSURED PERSON . . . in applying for such insurance." 166-1

16

at 16. Thus, NY Life can rely only on written statements signed by Stockton to prove its rescission grounds.

I find that substantial disputes of material fact exist regarding whether NY Life can satisfy these requirements, precluding summary judgment in Stockton's favor.

### a. The Validity of Stockton's Signature

A central dispute concerns whether NY Life possesses a written statement signed by Stockton as required by the incontestability provision. NY Life bases its rescission on Stockton's Statement of Insurability, which NY Life asserts bears Stockton's authorized signature. According to NY Life, Stockton participated in a telephone interview when applying for coverage on April 29, 2020, provided information about his medical history and activities, and authorized his signature to be affixed to the Statement of Insurability documenting his responses. Stockton argues that no written statement signed by him exists to support NY Life's rescission. Rather, NY Life obtained only a voice signature, which is not recognized under Virginia law.

This dispute cannot be resolved on summary judgment. Virginia's Uniform Electronic Transactions Act defines "electronic signature" as an "electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Va. Code § 59.1-480. The Act provides that electronic signatures satisfy legal signature requirements and may not be denied legal effect solely because they are electronic. *Id.* §§ 59.1-485, 59.1-487. However, the evidentiary weight accorded to an electronic signature is determined by the trier of fact considering five statutory factors: whether the signature is (1) unique to the signer, (2) capable of verification, (3) under the signer's sole control, (4) linked to the record such that it can be determined if data in the record was changed subsequent to the electronic signature being affixed, and (5) created by an appropriately reliable

17

method. *Id.* § 59.1-491. Here, material factual disputes exist regarding whether Stockton authorized his signature during the telephone interview, whether any such authorization constitutes a valid "electronic signature" under Virginia law, whether Stockton intended to sign the Statement of Insurability, what the statutory factors indicate about the signature's validity, and whether NY Life properly documented and implemented whatever signature process was used.

NY Life argues that Stockton's deposition testimony shows he cannot dispute authorizing his signature and that Stockton received the interview recording in October 2020 but never objected to the answers or signature. NY Life also argues Stockton cannot simultaneously claim coverage under the Policy, which required submission of the signed Statement of Insurability, while denying he signed the Statement. These arguments have merit, but they do not eliminate genuine disputes of fact. Whether Stockton authorized his signature, whether that authorization was valid under Virginia law, and what legal effect should be given to Stockton's subsequent silence are questions for the jury.[5]

### b.  What Information Stockton Disclosed

Even assuming the Statement of Insurability bears a valid signature, disputes exist regarding what information Stockton actually disclosed during his application. NY Life bases its rescission on three alleged omissions: (1) Stockton's history of neck pain; (2) Stockton's history of shoulder pain; and (3) Stockton's participation in mountaineering and related injuries.

NY Life first asserts that Stockton failed to disclose his history of cervicalgia and right

---

[5] NY Life has not provided the Statement of Insurability or the telephone interview recording to the Court in connection with this motion. Whether this recording demonstrates a valid signature process remains a factual question, and Stockton is entitled to challenge the authenticity and legal sufficiency of the purported signature at trial.

shoulder pain when asked about his medical history in Question 5.E of the Statement of

Insurability. Neither party provides detailed evidence regarding what Stockton disclosed about

his medical history during the telephone interview, but the record suggests disputes exist

regarding what was discussed. Indeed, NY Life contends Stockton now disputes whether he

disclosed his shoulder pain during the interview, suggesting that factual questions exist. Whether

Stockton disclosed his neck and shoulder pain, and whether any failure to disclose was knowing

and material, are factual questions requiring resolution at trial.

NY Life also asserts that Stockton failed to disclose his participation in mountaineering

when asked during the telephone interview. According to NY Life, rock climbing constitutes

mountaineering, and Stockton should have disclosed that he engaged in rock climbing when

asked about mountaineering. Stockton disputes this characterization, arguing that rock climbing

and mountaineering are two different sports and that he gave up mountaineering before 2005

because it was too dangerous. Stockton acknowledges engaging in rock climbing for many years

but denies he was asked about rock climbing during the telephone interview. Stockton also

denies ever suffering an injury requiring medical attention while rock climbing. These disputes

present factual questions that cannot be resolved on summary judgment, including whether rock

climbing falls within the definition of "mountaineering" as used in the application, whether

Stockton reasonably understood the question to encompass rock climbing, whether he truthfully

answered the question as he understood it, and whether he suffered injuries while rock climbing.

### c.  Materiality of Undisclosed Information

Even if Stockton failed to disclose certain information, NY Life must prove by clear

evidence that the undisclosed information was material to its decision to issue the Policy. NY

Life's rescission letter states that had Stockton disclosed his history of neck pain, shoulder pain,

19

and mountaineering activities and injuries, NY Life would have declined to provide coverage. Stockton, in turn, argues that his rock-climbing activities were not dangerous and did not result in injuries requiring medical attention.

Whether the undisclosed information was material presents a factual question. While NY Life's rescission letter provides evidence of materiality, I cannot determine materiality as a matter of law based solely on assertions within the letter, particularly where Stockton challenges those assertions.

For the reasons above, Plaintiff's Motion for Summary Judgment with Respect to Defendant's Attempt to Rescind Plaintiff's Coverage is **DENIED**.

### C. Plaintiff's Motion for Summary Judgment on Defendant's Third Affirmative Defense (Dkt. 113)

Stockton moves for summary judgment on NY Life's third affirmative defense, arguing that no factual basis exists to support either payment or accord and satisfaction as defenses to his claim for disability benefits.

#### 1. NY Life's Concession Regarding the Scope of Its Defense

As a threshold matter, NY Life's Response in Opposition to the instant motion substantially narrows the scope of its affirmative defenses. Specifically, NY Life states that it "has never argued that its defense of payment, or accord and satisfaction, relate to the payment of benefits under the Policy." Dkt. 121 at 5. Rather, NY Life asserts that these defenses relate to the refund of premium contributions that Stockton paid under the Policy. *See id.*

This concession is dispositive. Stockton seeks the monthly disability income benefits promised under the Policy—$15,000 per month beginning in October 2022—not recovery of the premiums he paid. Because NY Life has expressly admitted that its defenses of payment and accord and satisfaction do not relate to the payment of these benefits, those defenses cannot bar

Stockton's claim for disability benefits as a matter of law.

### 2. Payment as an Affirmative Defense

Even setting aside NY Life's concession, the defense of payment fails on the merits. Under Virginia law, payment is an affirmative defense requiring proof by the party asserting it. *Snidow v. Woods*, 96 S.E.2d 157, 159 (Va. 1957). Here, NY Life cannot meet its burden.

The undisputed facts establish that: (1) Stockton claims monthly disability benefits of $15,000 beginning in October 2022; (2) the check NY Life tendered is for $12,926.49, representing a refund of premiums plus interest; (3) Stockton has not deposited, negotiated, or otherwise obtained payment of the check; and (4) Stockton has expressly declined to accept the check and stands willing to return it.

A check for $12,926.49, which purports to refund premiums and not pay benefits, cannot constitute payment of the substantially larger claim for monthly disability benefits of $15,000 each. The amounts and purposes are different, and more importantly, no payment has actually occurred. NY Life has thus failed to establish any factual basis for a defense of payment with respect to Stockton's claim for disability benefits under the Policy.

### 3. Accord and Satisfaction as an Affirmative Defense

NY Life's defense of accord and satisfaction fares no better. Under Virginia law, "[a]n accord and satisfaction is a method of discharging a contract, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, the accord being the agreement and the satisfaction its execution or performance." *Montalla, LLC v. Commonwealth*, 900 S.E.2d 290, 301 (Va. 2024) (citation modified) (citing *Atkins v. Boatwright*, 132 S.E.2d 450, 454 (Va. 1963)). The burden is on a debtor to prove an accord (agreement) and satisfaction (performance). *John Grier Const. Co. v. Jones Welding & Repair, Inc.*, 383 S.E.2d

719, 720 (Va. 1989) (citation omitted).

NY Life cannot establish either element. First, there is no evidence that Stockton agreed to accept a refund of his premiums in satisfaction of his claim for monthly disability benefits; NY Life's check was unsolicited. Second, Stockton has not accepted the check and, in fact, has affirmatively stated his intention not to accept the check. The Virginia Uniform Commercial Code reinforces this conclusion. Virginia Code § 8.3A-311 provides that if a person against whom a claim is asserted tenders a check as full satisfaction of the claim, the claim is not discharged unless the claimant obtains payment of the check. *See also Helton v. Phillips A. Glick Plumbing, Inc.*, 673 S.E.2d 842, 844 (Va. 2009) (noting it was undisputed that plaintiff "received and deposited the check"). Here, since Stockton never cashed the check, his claim was never discharged.

### 4. NY Life's Arguments Lack Merit

NY Life argues that factual issues remain because its affirmative defenses were pled "to the extent applicable" and because Stockton's future conduct with the check remains uncertain. Dkt. 121 at 6. These arguments are without merit.

First, the conditional nature of NY Life's pleading does not create a genuine issue of material fact. The record demonstrates that neither payment nor accord and satisfaction occurred with respect to Stockton's claim for disability benefits. While NY Life may have a potential defense to a claim for premium refunds, this defense would only be relevant to a hypothetical future claim for such refunds, not to the disability benefits claim currently at issue. Second, NY Life's speculation about Stockton's future conduct is irrelevant. Summary judgment is decided based on the current state of the facts, *see Forma AI Inc. v. Twic, Inc.*, No. 4:23-CV-00077-BO-BM, 2025 WL 978979, at *7 (E.D.N.C. Mar. 31, 2025), and those facts demonstrate that

Stockton has not accepted or negotiated the check and has stated his intention not to do so. Stockton's hypothetical future actions do not create a genuine dispute of material fact.

Finally, NY Life's argument that the check demonstrates its good faith in executing the rescission does not save its affirmative defenses. Whether NY Life acted in good faith is a separate inquiry from whether payment or accord and satisfaction occurred. Even if tender of the check were relevant to a good faith analysis, it does not establish that Stockton's claim for disability benefits has been paid or settled.

Accordingly, Plaintiff's Motion for Summary Judgment with Respect to Defendant's Third Affirmative Defense is **GRANTED**.

### D. Defendant's Motion for Summary Judgment (Dkt. 144)

NY Life moves for summary judgment on multiple grounds, arguing that: (1) Stockton fraudulently induced NY Life to provide coverage by misrepresenting his other insurance; (2) Stockton materially breached the contract by failing to replace his other coverage; (3) under the 66 2/3% provision, no monthly benefit is available because Stockton already receives disability payments exceeding that threshold; (4) Stockton's coverage ended when he stopped working in April 2022, before any alleged disability arose; and (5) the false date provided by Stockton triggered the contestable review and constituted material breach.

### 1. Issues Related to Other Disability Insurance Coverage

NY Life advances three related theories based on Stockton's other disability insurance coverage: (1) fraud in the inducement, (2) first material breach of contract, and (3) contractual bar to benefits under the 66 2/3% provision. Each theory fails at summary judgment for independent reasons.

### a. Fraud in the Inducement

To prevail on a claim for fraudulent inducement, a plaintiff must prove the following

elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Whalen v. Rutherford*, No. 3:12CV00032, 2013 WL 3174702, at *3 (W.D. Va. June 21, 2013) (citing *Evaluation Rsch. Corp.*, 439 S.E.2d at 390). Here, NY Life alleges that Stockton falsely represented that his other disability insurance totaled only $15,000 per month and that the coverage requested from NY Life would replace that other insurance in the amount of $15,000 per month.

Genuine disputes of material fact preclude summary judgment on NY Life's fraud claim. First, the record does not clearly establish that Stockton's representations about replacing $15,000 in coverage were false at the time they were made. NY Life contends that they were, whereas Stockton testified that he initially intended to cancel his existing policies but later changed his mind. Second, the parties disagree as to whether NY Life provided Stockton with a document that contained the 66 2/3% limitation on which NY Life now relies, and Stockton argues that if NY Life intended to rely on specific limitations regarding other insurance, it should have ensured those limitations were clearly disclosed to applicants.

Third, and most significantly, NY Life's fraud claim may be barred by the Policy's incontestability provision. Virginia courts have long held that incontestability clauses protect insureds from insurers who delay in asserting defenses based on alleged misrepresentations. *See Harrison v. Provident Relief Ass'n of Washington*, *D.C.*, 126 S.E. 696, 700 (Va. 1925). In this case, Stockton's coverage was in force for over two years when he filed his claim on December 11, 2022, and nearly five years when NY Life first raised issues related to his other disability insurance on April 11, 2025. NY Life argues the incontestability provision does not apply to issues concerning the extent of coverage. However, the provision states that NY Life "cannot

contest the validity of any insurance" after two years, and rescission based on alleged misrepresentations in the application directly implicates the validity of insurance coverage. Indeed, NY Life's own March 7, 2023 letter stated it was investigating "whether there is any adverse medical or financial history that would have altered New York Life's decision to provide the coverage." Dkt. 85-32 at 1. Such language clearly relates to validity of coverage, not merely extent of benefits. NY Life had ample opportunity to investigate Stockton's other insurance when he filed his claim in December 2022, disclosing all three policies. Instead, it waited more than two years to assert this defense. Because the incontestability provision may bar this belated challenge to coverage validity, summary judgment on the fraud in the inducement theory is inappropriate.

### b. Material Breach of Contract

NY Life next argues that Stockton materially breached the Policy by failing to replace his other disability insurance as he represented he would do in his application. However, NY Life has not identified any express contractual provision requiring Stockton to cancel his existing policies. The application form asked whether coverage would replace other insurance and how much would be replaced. Stockton's affirmative answer may have represented his intent at the time, but NY Life points to no policy language creating an ongoing contractual obligation to follow through with that intent. Consequently, NY Life's argument is more properly understood as part of its rescission theory—namely, that Stockton made a misrepresentation in the application and that the alleged misstatement was material to underwriting.

Even if Stockton's statement in the application could be construed as creating a contractual obligation, Virginia law requires that the first material breach doctrine be applied carefully. A breach is material only where it "defeats an essential purpose of the contract."

*Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) (citation omitted). NY Life has not demonstrated that Stockton's retention of his other policies defeated an essential purpose of the Policy. The Policy continued in force, and NY Life did not raise this issue until years after coverage began. Whether Stockton's retention of other policies constituted a breach—and if so, whether that breach was material—presents factual questions inappropriate for resolution on summary judgment.

Finally, NY Life's argument is undermined by its own conduct. After receiving Stockton's claim form disclosing all three policies in December 2022, NY Life continued to accept premium payments from Stockton through June 2023. Further, NY Life engaged in a five-month investigation without questioning Stockton about his other insurance or the amount of benefits he was receiving from other carriers. This conduct suggests that NY Life did not view the retention of other insurance as a material breach warranting immediate termination of coverage. Accordingly, NY Life is not entitled to summary judgment on its material breach theory.

### c.  Contractual Bar to Benefits Under the 66 2/3% Provision

NY Life then argues that even if coverage is not rescinded, Stockton cannot recover benefits because he already receives disability payments from other sources exceeding 66 2/3% of his average monthly income, thereby triggering a contractual bar in the Policy. For several reasons, I cannot resolve this issue on summary judgment.

As a threshold matter, this argument faces an evidentiary problem: NY Life has not established that the 66 2/3% limitation existed in the Policy when Stockton's coverage became effective in 2020 or when Stockton filed his claim in 2022. Although NY Life has filed a policy that it contends was the operative policy on June 1, 2020, Stockton does not concede that these

documents governed his claim. This dispute alone precludes summary judgment.

Even assuming the provision was in place when Stockton applied for coverage in 2020 and filed his claim in 2022, the record contains no evidence establishing what disability benefits Stockton has actually received from other sources. Neither party has submitted documentation of Stockton's payments, the amounts, or the relevant time periods. Without this information, I cannot determine whether Stockton's combined benefits exceed the 66 2/3% threshold or whether the contractual limitation would bar additional benefits.

Additionally, Stockton argues he cannot be bound by the 66 2/3 % provision because it was not disclosed to him in the Certificate of Insurance he received when his coverage was approved. However, the Certificate expressly disclaimed being a "contract of insurance" and directed insureds to the Policy for complete terms. Under Virginia law, the master policy governs the terms of group insurance coverage, and the insurer is not required to restate every contractual limitation in the certificate so long as the limitation appears in the Policy itself. *See Essex Ins. Co. v. Y&J Constr., Inc.*, No. 1:15-CV-1597, 2016 WL 8254921, at *11 n.26 (E.D. Va. Dec. 30, 2016) (citation omitted) ("[A] certificate of insurance is not—and does not create—an insurance contract, nor must a certificate contain all the terms of an insurance policy."). Thus, if the limitation appears in the operative Policy, Stockton is bound by it.

Stockton also argues NY Life waived reliance on the 66 2/3% limitation because it never inquired about Stockton's other disability benefits and did not raise this limitation as a defense until nearly three years after receiving his claim. Whether NY Life's failure to raise the limitation earlier constitutes an intentional relinquishment is a factual question to be resolved at trial.

Genuine disputes of material fact therefore preclude summary judgment on the

27

contractual bar theory. A reasonable jury could find that the 66 2/3% provision did not apply to Stockton's claim, or that NY Life waived the limitation given its conduct after receiving Stockton's claim.

### d. Insurable Interest

Based on the three aforementioned grounds, NY Life argues that Stockton lacked an insurable interest as a matter of Virginia law and public policy, rendering the Policy an unlawful wagering agreement subject to rescission.

This argument is unpersuasive. Virginia law has never applied an insurable interest requirement to disability income insurance. Virginia Code § 38.2-303 applies insurable interest requirements only to property insurance, and *Scottsdale Ins. Co. v. Glick*, 397 S.E.2d 105 (Va. 1990), extends this to liability insurance. NY Life cites *Fulcher v. Parker*, 194 S.E. 714 (Va. 1938), which merely holds that an insurable interest is not required for industrial life insurance policies. NY Life also cites Virginia Code § 38.2-301, but that statute expressly permits "[a]ny individual of lawful age" to "take out an insurance contract upon himself for the benefit of any person." Lastly, NY Life's citation to *Breault v. Berkshire Life Ins. Co.*, 821 F. Supp. 410, 415 (E.D. Va. 1993), is inapposite. *Breault* held that information about existing coverage is material to an insurer's underwriting decision—a proposition Stockton does not dispute. But *Breault* did not hold that an insured lacks an insurable interest merely because he has other coverage or that such coverage renders the policy void as a wagering agreement. Thus, NY Life's insurable interest arguments fail as a matter of law and do not warrant summary judgment.

### 2. The "False Date" Issue

NY Life advances two arguments based on what it characterizes as Stockton's "false date" regarding when he last worked: (1) that Stockton's coverage ended under the "When

28

Insurance Ends" provision when he stopped working in April 2022, before any disability arose and (2) that Stockton cannot complain about NY Life's contestable review because his false date triggered that review.

### a. Whether Coverage Ended When Stockton Stopped Working

The Policy provides that coverage ends on "the date the INSURED PERSON is no longer at ACTIVELY ENGAGED FULL-TIME WORK." Dkt. 166-1 at 14. NY Life argues that because Stockton stopped working in April 2022 without being disabled at that time, his coverage terminated and no benefits are available for any later disability.

However, there are genuine disputes of material fact regarding when and why Stockton stopped working. In particular, the parties dispute whether Stockton stopped working because he was already disabled or for other reasons. Stockton contends he stopped working because of symptoms he was experiencing, even though he had not yet received a diagnosis. Importantly, the Policy defines "Covered Total Disability" in terms of whether an injury or sickness prevents the insured "from doing the material and substantial duties of his or her regular occupation." Dkt. 166-1 at 9. It does not require a formal diagnosis. The question of whether Stockton was disabled when he stopped working and whether his decision to stop working was caused by a disabling condition present factual issues for the jury.

NY Life's interpretation of the "WHEN INSURANCE ENDS" provision is unreasonably harsh. Under NY Life's reading, an insured who stops working due to symptoms of an undiagnosed condition would immediately forfeit coverage, even if later diagnosed with a disabling illness that had caused those symptoms. This interpretation would defeat the essential purpose of disability insurance—to protect against loss of income due to illness or injury.

Finally, NY Life's conduct undermines its position. After receiving Stockton's claim stating that he last worked on April 19, 2022, NY Life continued to collect premiums through June 2023. NY Life never notified Stockton that it considered his coverage terminated as of April 2022 or offered to refund premiums paid after that date. Instead, NY Life began an investigation and eventually rescinded coverage on grounds unrelated to when Stockton stopped working.

### b.  Whether Stockton's "False Date" Bars His Claims

NY Life argues that Stockton cannot recover because his "false date" triggered NY Life's contestable review, and he cannot complain about the results of a review that his own misrepresentation caused. This argument is unpersuasive for multiple reasons.

First, the record does not support NY Life's characterization. The record reflects that Stockton made an honest mistake about the date he last worked, amounting to only a five-day difference. When Stockton discovered the error, he promptly disclosed the correction to NY Life. During his deposition, Stockton testified that April 24, 2022 was the correct date. This is not the type of fraudulent conduct that would bar Stockton's claims.

Second, NY Life's own March 7, 2023 letter undermines its argument. The letter states: "Because your claim was submitted within 2 years from the effective date of coverage, we are conducting a routine investigation." Dkt. 85-32 at 1. This language indicates that the contestable review was triggered by the date the claim was submitted—December 11, 2022—not by any particular representation about when Stockton last worked. Whether Stockton last worked on April 19 or April 24, 2022 is immaterial to the two-year contestability period, which ran from June 1, 2020 to June 1, 2022.

30

Third, NY Life has not demonstrated that it was prejudiced by Stockton's mistake about the date. The five-day difference between April 19 and April 24, 2022 is not material to any substantive issue in the case. NY Life does not claim it would have conducted a different investigation or reached a different conclusion if Stockton had initially provided April 24 rather than April 19 as his disability date.

Finally, NY Life's argument based on "first material breach" is misplaced. Virginia law does not bar a party's claims simply because that party made a mistake in stating a fact. To establish that Stockton's misstatement warrants dismissal of his claims, NY Life must show that any breach was in fact material. *See Filak*, 594 S.E.2d at 614. Here, Stockton's minor error about a date is better characterized as a misrepresentation rather than a breach of contract, and in any case, it does not rise to the level of material breach, particularly where he corrected the error and NY Life suffered no prejudice.

### c. The Sham Affidavit Rule

In its reply brief, NY Life argues that Stockton's Third Declaration should be disregarded under the sham affidavit rule because it contradicts Stockton's earlier deposition testimony. The sham affidavit rule provides that "a party cannot create a triable issue in opposition to summary judgment simply by contradicting his deposition testimony with a subsequent affidavit." *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999) (citation omitted). However, the rule applies only where there is a "bona fide inconsistency" between deposition testimony and later affidavit. *Kinser v. United Methodist Agency for the Retarded—W. N.C., Inc.*, 613 Fed. App'x 209, 210–11 (4th Cir. 2015) (citation omitted).

I have reviewed Stockton's Third Declaration and find no bona fide inconsistencies warranting application of the sham affidavit rule. Stockton's statement that he believed he was

31

increasing his total disability coverage by keeping his existing policies and obtaining NY Life

coverage is consistent with his deposition testimony that he initially intended to replace the

existing policies but later decided to keep them. The Third Declaration provides additional

context and explanation but does not contradict the substance of his prior testimony. Similarly,

Stockton's Third Declaration explaining that he was misled about which version of the Policy

was in effect does not contradict his deposition testimony, where he was not questioned on this

subject. And Stockton's testimony that April 24, 2022, not April 19, was his last day of work

appeared in his deposition itself, not solely in his Third Declaration. Accordingly, the sham

affidavit rule does not warrant disregarding Stockton's Third Declaration.

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**.

### E. Cross-Motions for Summary Judgment Regarding Unclean Hands (Dkts. 142 and 149)

Stockton moves for summary judgment to apply the unclean hands doctrine to bar NY

Life from rescinding his disability insurance coverage. NY Life opposes Stockton's motion and

cross-moves for summary judgment on its unclean hands defense.[6]

### 1. Whether the Unclean Hands Doctrine Applies

"The doctrine of 'unclean hands' is an ancient maxim of equity courts." *Richards v.*

*Musselman*, 267 S.E.2d 164, 166 (Va. 1980) (citation omitted). This defense "prevents a plaintiff

from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful

conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68

F. App'x 447, 451 (4th Cir. 2003) (quoting *Richards*, 267 S.E.2d at 166 n.1).

---

[6] The deadline for filing dispositive motions was September 9, 2025. Stockton filed his motion to apply the unclean hands doctrine on that date, and NY Life filed its cross-motion on September 23, 2025. Although the cross-motion is untimely, I will consider it in the interest of resolving the parties' overlapping arguments on the unclean hands defense on the merits.

Traditionally, the unclean hands doctrine applied only to claims for equitable relief, not legal claims for damages. Stockton argues that because his claims are for breach of contract damages at law, the unclean hands doctrine does not apply to bar his action against NY Life. NY Life argues that federal courts have extended the doctrine to bar legal claims in appropriate circumstances.

NY Life cites to cases demonstrating that some federal courts have extended unclean hands principles beyond purely equitable claims. However, these cases typically concern extraordinary instances of fraud or dishonesty. *See Buchanan Home & Auto Supply Co. v. Firestone Tire & Rubber Co.*, 544 F. Supp. 242 (D.S.C. 1981) (involving forgery of adjustment forms); *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103 (D. Md. 1989) (involving false statements in response to interrogatories and deposition questions); *Tempo Music, Inc. v. Myers*, 407 F.2d 503 (4th Cir. 1969) (involving recovery for copyright infringement caused by plaintiffs' own agent). Virginia law has not clearly adopted an expansion of the doctrine, particularly in a case such as this. I therefore cannot grant summary judgment to bar Stockton's claims at law.

Moreover, even if the unclean hands doctrine could bar legal claims in Virginia, genuine disputes of material fact preclude summary judgment for either party on this issue. Application of the doctrine requires a fact-intensive inquiry into the parties' conduct, the relationship between that conduct and the claims at issue, and whether equitable considerations warrant barring relief. These questions cannot be resolved on the current record.

### 2. Stockton's Alleged Unclean Hands

NY Life identifies multiple categories of allegedly wrongful conduct by Stockton: (1) misrepresentations about his medical history; (2) misrepresentations about his recreational

activities; (3) misrepresentations about his existing insurance coverage and failure to replace that

coverage; (4) providing a false disability onset date; and (5) delaying notice of his claim.

First, NY Life presents evidence that Stockton failed to disclose his history of neck pain,

shoulder pain, and rock-climbing injuries when applying for coverage. NY Life's rescission

letter states that had these conditions been disclosed, it would have declined to provide coverage.

Several material factual and legal disputes exist regarding these alleged misrepresentations,

including the scope and severity of Stockton's medical conditions at the time of application,

whether these conditions were material to the risk NY Life assumed, and the causal connection

between any alleged misrepresentations and Stockton's current disability from Lewy body

dementia.

NY Life then alleges that Stockton misrepresented his insurable interest by failing to

follow through on his representation to replace his existing coverage. However, factual and legal

disputes remain regarding Stockton's intent at the time he applied for coverage, whether

Stockton's failure to cancel the other policies constitutes fraud or merely a change of plans, and

the effect of the Policy's limitation on total disability coverage.

Finally, NY Life argues that Stockton's delay in giving notice of his claim while also

providing a false disability date triggered NY Life's investigation and rescission. But significant

disputes exist regarding why Stockton stopped working; whether Stockton's symptoms, even if

undiagnosed, rendered him disabled as of April 24, 2022; whether the misrepresentation was

material; Stockton's understanding of the Policy's notice requirements; and Stockton's intent in

delaying submission of his claim. These disputes preclude a determination that Stockton's hands

are so unclean as to bar his entire claim as a matter of law.

### 3.  NY Life's Alleged Unclean Hands

34

Stockton, in turn, argues that NY Life's hands are unclean based on: (1) unreasonable delay in rescinding the Policy; (2) making false statements about when the claim was submitted; and (3) continuing to collect premiums while investigating grounds for rescission.

First, Stockton emphasizes that NY Life rescinded his coverage more than three years after it became effective and more than one year after the contestability period expired. Stockton argues this delay was unreasonable and inequitable, particularly where NY Life continued collecting premiums throughout the investigation. Stockton relies on language from a vacated Fourth Circuit panel opinion in *Bernstein v. Nationwide Mut. Ins. Co.*, 458 F.2d 506, 510 (4th Cir. 1972), which states that "[t]he remedy is to refuse rescission where the policy has been in effect without repudiation after a reasonable time for investigation of the risk." The panel suggested that "[t]hirty days would seem abundant" for such investigation and that seeking rescission after unreasonable delay constitutes coming "into equity without clean hands." *Id.* NY Life responds that the *Bernstein* panel opinion was vacated and has no precedential value. While vacated opinions have no precedential effect, *see O'Connor v. Donaldson*, 422 U.S. 563, 578 n.12 (1975), the reasoning of the vacated *Bernstein* opinion raises important equitable considerations. Allowing insurers unlimited time to rescind policies undermines the security that insurance is meant to provide and creates an inequitable situation where insurers collect premiums but reserve the right to deny coverage indefinitely based on alleged misrepresentations in the application. *See Bernstein*, 458 F.2d at 510.

Central to Stockton's argument is that the Policy's incontestability provision explicitly barred NY Life from contesting coverage after June 1, 2022. NY Life contends that its contest was timely because Stockton's claimed disability onset date of April 19, 2022 fell within the contestability period. However, the plain language of the incontestability provision states that

NY Life "cannot contest the validity of any insurance on an INSURED PERSON after it has been in force for two years prior to the contest." The provision focuses on when the contest occurs, not when the claimed disability began. Indeed, NY Life's interpretation would render the incontestability provision largely meaningless. Any insurer who becomes disabled could be subjected to a contestability review based solely on when their disability began, regardless of when they actually file a claim or when the insurer contests coverage. This reading cannot be reconciled with the provision's purpose of providing security after a specified period. Finally, the evidence shows that NY Life's employees repeatedly told Stockton that his "claim was submitted within 2 years from the effective date of coverage." These statements—made in writing on March 7, 2023 and June 9, 2023—were factually incorrect. While NY Life now attempts to recharacterize these statements as referring to the disability onset date rather than claim submission date, the plain language of the communications contradicts this interpretation. Thus, NY Life could not have contested coverage before Stockton submitted his claim in December 2022—over six months after the contestability period expired.

Despite these concerns about NY Life's conduct, material factual disputes preclude summary judgment in Stockton's favor, including whether NY Life's delay in rescinding the Policy was unreasonable under the circumstances; whether NY Life's statements about the claim submission date were intentionally misleading; whether NY Life had legitimate grounds for rescission based on Stockton's misrepresentations even absent the contestability period issue; and the proper interpretation of the Policy's incontestability provision and its interaction with NY Life's rescission rights. These disputes involve mixed questions of fact and law that cannot be resolved on summary judgment.

### 4. The "First in Time" Principle

36

NY Life argues that even if both parties have unclean hands, Stockton's wrongful conduct came first in time and therefore bars his claims. However, this principle does not provide a basis for summary judgment. Temporal priority alone does not determine the outcome under the unclean hands doctrine. Rather, "[a]pplication of the doctrine turns upon the facts of each particular case and is therefore left to the sound discretion of the fact finder." *Cline v. Berg*, 639 S.E.2d 231, 234 (Va. 2007) (citation omitted). Here, material factual disputes exist regarding the timing and nature of both parties' alleged misconduct. While Stockton's application misrepresentations preceded NY Life's alleged misconduct, NY Life had two years to investigate Stockton's application and contest coverage based on any misrepresentations. By allowing the contestability period to expire without taking action, NY Life may have waived certain rights to contest coverage, regardless of Stockton's prior misconduct.

### 5.  Whether Stockton Waived the Unclean Hands Defense

Clean hands is an affirmative defense that must be affirmatively stated in response to a pleading. Fed. R. Civ. P. 8(c); *see Great E. Resort Corp. v. Virtual Resort Sols., L.L.C.*, 189 F. Supp. 2d 469, 480 (W.D. Va. 2002). Under Fourth Circuit precedent, failure to plead an affirmative defense typically results in waiver. *See RCSH Operations, L.L.C. v. Third Crystal Park Assocs. L.P.*, 115 Fed. App'x 621, 629 (4th Cir. 2004) ("It is settled that a failure to raise an affirmative defense in the appropriate pleading results in the loss of that defense." (citations omitted)).

NY Life argues Stockton waived the clean hands defense by failing to assert it in his Answer to NY Life's counterclaims. Stockton responds that he invoked clean hands only to oppose NY Life's attempt to rescind coverage—an equitable remedy—and not to defend against counterclaims seeking damages—a legal remedy.

37

Stockton is correct that the unclean hands doctrine is generally limited to equitable relief. *See Butler v. Hayes*, 487 S.E.2d 229, 232 (Va. 1997) ("[A] litigant who seeks to invoke an equitable remedy must have clean hands."). The issue is whether NY Life's counterclaims, which request, among other things, that "Plaintiff receive nothing from NYLIC," constitutes equitable relief. Dkt. 77 at 20. In this case, the request that Stockton "receive nothing" appears to be the natural consequence of successfully defending against Stockton's breach of contract claim rather than affirmative equitable relief sought in the counterclaims themselves. NY Life's position that the Policy should be rescinded is the same whether framed as a defense to Stockton's claim or as a counterclaim. Stockton invoked clean hands to oppose that rescission. He is not required to separately plead clean hands in his answer to counterclaims that essentially mirror NY Life's defense.

Additionally, even if there was a pleading deficiency, waiver is not automatic upon failure to plead an affirmative defense. The Fourth Circuit requires a showing of prejudice or unfair surprise. *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010) (citations omitted). Here, there does not appear to be unfair surprise. The factual basis for both parties' unclean hands arguments arises from the same core conduct and discovery. NY Life cannot claim surprise about Stockton's potential clean hands argument when both sides developed the relevant facts through discovery. Additionally, there is limited prejudice because NY Life already litigated the underlying conduct through depositions and document discovery. The legal theory of clean hands does not require different or additional factual development. A reasonable jury could therefore find that the requirements for waiver are not met.

In sum, neither party has demonstrated the absence of genuine disputes of material fact regarding the nature, extent, timing, and legal consequences of the other party's potentially

38

wrongful conduct. Accordingly, Plaintiff's Motion for Summary Judgment to Apply the Clean

Hands Doctrine to Defendant's Attempt to Rescind Plaintiff's Coverage Under the Policy (Dkt.

142) is **DENIED**. Defendant's Cross-Motion for Summary Judgment Regarding Unclean Hands

(Dkt. 149) is similarly **DENIED**.

## IV.    Conclusion

For the reasons above, Plaintiff's Motion for Summary Judgment on Defendant's First

and Third Counterclaims (Dkt. 105) and Motion for Summary Judgment with Respect to

Defendant's Third Affirmative Defense of Payment and Accord and Satisfaction (Dkt. 113) are

**GRANTED**. All other motions are **DENIED**.

Entered:  March 31, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

39